[Cite as *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 2015-Ohio-3841.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Tonya Amoako-Okyere,<br>Special Administrator of the Estate of<br>James McCoy III, Deceased, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 14AP-441<br>(C.P.C. No. 10CV-3515) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Church of the Messiah United<br>Methodist Church et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on September 22, 2015

*Clifford O. Arnebeck, Jr.*; *Colbert Davis LLP, Franklin C. Davis*, and *Brett A. Colbert*, for appellant.

*Reminger Co., L.P.A.,* and *Melvin J. Davis,* for Church of the Messiah United Methodist Church

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Plaintiff-appellant, Tonya Amoako-Okyere, special administrator of the estate of James McCoy III, appeals from a decision and entry of the Franklin County Court of Common Pleas, granting a directed verdict in favor of defendant-appellee Church of the Messiah United Methodist Church ("the Church"). Amoako-Okyere additionally appeals from the trial court's decision and entry denying her motion for new trial. For the following reasons, we affirm.

## I.  Facts and Procedural History

{¶ 2}   On April 22, 2006, while attending the Church's youth camp at Camp Cotubic in Logan County, Ohio, McCoy died from choking and asphyxiation.  It was his 18th birthday.  Amoako-Okyere, McCoy's mother, initially filed a complaint on April 23, 2007 against the Church and John Does 1 through 8, asserting a claim for wrongful death.  Amoako-Okyere eventually voluntarily dismissed that complaint on March 5, 2009.

{¶ 3}   On March 5, 2010, Amoako-Okyere refiled the complaint, this time naming the defendants as the Church, Adam Conti (another camper), and John Does 1 through 3, asserting a survivorship action and a wrongful death claim.  The Church filed an answer on April 9, 2010 denying any wrongdoing and asserting the affirmative defenses of, among others, McCoy's contributory negligence, the intervening negligence of a third-party, and the lack of any duty owed to McCoy because he was 18 years old at the time of his death.  Amoako-Okyere filed a notice of voluntary dismissal on August 11, 2010 to dismiss the claims against Conti, which were barred by the applicable statute of limitations.

{¶ 4}   On September 27, 2010, the Church filed a motion for summary judgment, arguing Amoako-Okyere's claim of "negligent supervision" fails as a matter of law for Amoako-Okyere's failure to join as primary tortfeasor before the expiration of the statute of limitations.  The trial court denied the Church's motion for summary judgment in a June 9, 2011 decision and entry, stating that "[i]t would seem to this Court that a church which runs a church camp would have some duties with regard to participants in the church camp, especially children.  If the law says otherwise, [the Church] has not pointed to any such law."

{¶ 5}   A jury trial commenced on February 18, 2014.  We initially note that Amoako-Okyere provided this court only with excerpted portions of the trial transcript rather than a full transcript, so the facts discussed below are only those provided to this court for review.  Amoako-Okyere testified that McCoy asked her if he could attend the youth camp with the Church, so she went to the Church to speak with Roy Mitchell, the youth pastor, about the camp.  Amoako-Okyere said she specifically asked Mitchell about supervision during the retreat and Mitchell told her "not to worry about it, we will take good care of him, he is a good kid."  (Tr. Vol. I, 8.)  Mitchell informed her the group would

leave for camp on Friday, April 21, 2006 around 4:00 p.m. and return around 12:00 p.m. on Sunday, April 23, 2006.

{¶ 6}  On the morning of April 22, 2006, McCoy called Amoako-Okyere from the camp because it was his birthday and said, "Hey, mom, I'm a man now, I'm 18," and Amoako-Okyere reminded him that because he was born at 5:06 p.m., he was not "fully a man until 5:06." (Tr. Vol. I, 9.) Later that day, Amoako-Okyere received a phone call from her mother that someone had contacted her indicating McCoy had "had an accident," so Amoako-Okyere called the phone number provided to her and was connected to the police department. (Tr. Vol. I, 13.) The police connected her to the hospital, and a doctor informed her that her son had died after being found "hung with a belt." (Tr. Vol. I, 13.) Amoako-Okyere testified that the doctor gave her no indication that McCoy's death was a suicide. The first time she heard anyone mention suicide was when she went to the hospital to identify McCoy's body and a nurse offered her condolences and said, "suicide is a hard thing." (Tr. Vol. I, 19.) The suggestion of suicide made Amoako-Okyere "irate" because it "was never [McCoy's] nature," as he was "[h]appy-go-lucky," and not depressed. (Tr. Vol. I, 19.)

{¶ 7}  Because she was upset with how she was treated at the hospital, Amoako-Okyere insisted that the Logan County Coroner not be the one to perform the autopsy, and she agreed to have the Montgomery County Coroner perform the autopsy instead.

{¶ 8}  Sometime after McCoy's death, Conti came over to Amoako-Okyere's house and she asked him what happened to her son. Conti told her that he was the one who found McCoy and cut him down from the tree. Both Conti and another girl who was at the camp, identified as Hayley Anderson, told Amoako-Okyere that McCoy was depressed. After finding McCoy hanging in the tree, Conti sent another camper to inform Mitchell. Conti told Amoako-Okyere that Mitchell ran through the woods to find them and then instructed another camper to call 911.

{¶ 9}  In the days following McCoy's death, Amoako-Okyere said that Mitchell came to her house and she asked him what happened to her son. Mitchell told her that on the morning that McCoy died, it "seemed like everything was going well" and they sang "Happy Birthday" to McCoy. (Tr. Vol. I, 29.) When one of the kids told him something had happened to McCoy, he ran to where McCoy's body was and attempted to perform

CPR. Amoako-Okyere said she asked Mitchell about seeing a belt around McCoy's neck and that Mitchell told her he had no recollection of any belt. When Amoako-Okyere asked Mitchell how this could happen, she said Mitchell told her, "I'm sorry, we screwed up. We didn't watch the boys." (Tr. Vol. I, 29.) Mitchell was accompanied by the senior pastor from the Church, and the senior pastor informed Amoako-Okyere that they had found a document in McCoy's handwriting that indicated some suicidal ideations but that the Church had turned that document over to police and Amoako-Okyere was unable to view it.

{¶ 10} Amoako-Okyere contacted the Logan County Coroner to ask how he could conclude McCoy's death was a suicide if he did not actually see the body. The coroner told her that the police handled the investigation and he concurred with the conclusion that it was a suicide by asphyxiation and hanging. Amoako-Okyere then contacted the Federal Bureau of Investigation ("FBI"), and they assured her they would look into the investigation and that if the police did anything improper, the FBI would handle it. After that initial conversation, two agents from the FBI came to her house and she offered to provide them with access to McCoy's computer and belongings. Ultimately, the FBI sent Amoako-Okyere a letter stating the Justice Department did not find a federal crime in this situation.

{¶ 11} The excerpted transcript Amoako-Okyere provided to this court did not include her testimony on cross-examination.

{¶ 12} Barbara Gilliam, Amoako-Okyere's mother and McCoy's grandmother, also testified. She said she was present when Mitchell came to visit her daughter after McCoy's death and that Mitchell said "they weren't watching the kids like they should have, and he was very, very sorry." (Tr. Vol. I, 96.)

{¶ 13} The executive director of Camp Cotubic at the time of McCoy's death, David L. Stephens, testified that although he is "semi-retired" now, he held the position of executive director at the camp for 26 years. (Tr. Vol. II, 106-07.) Stephens explained that Camp Cotubic rented its facilities to the Church and provided food, lodging, and amenities for the youth retreat. On April 22, 2006, Stephens was in the dining hall at lunchtime with Mitchell when a camper came in and whispered something in Mitchell's ear that caused Mitchell to turn and leave the room immediately. Prior to that, Stephens

did not hear anyone ask or inquire where McCoy was or note that he was not present in the dining hall. Stephens looked out the window and saw the direction Mitchell and the camper were headed, so Stephens got in his vehicle and followed them. Stephens described the section of woods where Mitchell was running as "very difficult to get into," and he said that in his 26 years at the camp, he had not "seen anybody in that section of woods other than deer hunters." (Tr. Vol. II, 108.) In order to actually reach McCoy, Mitchell had to crawl across a large tree that was straddling a ravine. When pressed on re-direct exam whether this incident occurred in a remote place on the camp's property, Stephens reiterated that he did not think you would be able to see it happen unless you knew what you were looking for due to the density of the trees and the steep incline in the landscape, but he admitted that everything happened "within eyeshot" of the main camp facilities. (Tr. Vol. II, 171.)

{¶ 14} By the time Stephens caught up with Mitchell, Mitchell was down on his knees performing CPR on McCoy. Stephens described assisting the first responders, including paramedics, the fire department, and the sheriff's department, find the exact location in the woods. Mitchell rode in the ambulance with McCoy and Stephens stayed behind at the camp.

{¶ 15} Stephens said that when he finally arrived at the spot where McCoy was, the only people there were Mitchell and McCoy. Off to the east, there was a "commotion" involving another camper who was hysterical and a staff member trying to calm him down. (Tr. Vol. II, 111.) Stephens could not remember anything that the other camper said, just noting that he was "screaming" and "hysterical." (Tr. Vol. II, 112.) Stephens identified this other camper as Conti and said he saw Conti "running across the grounds with a [camp staffer] chasing after him," but that was not his focus at the time. (Tr. Vol. II, 115.) When asked if McCoy had a belt around his neck when Stephens saw him, Stephens said he could not "answer that for sure," and that he "can't picture it." (Tr. Vol. II, 112.) Stephens said that based on what he saw at the scene, he assumed McCoy had committed suicide. Upon looking back on the situation, however, Stephens said "there was a possibility that it wasn't just an all-out suicide, but it might have been the choking game that kids -- it was predominant during that time." (Tr. Vol. II, 157.) Stephens had not heard of the "choking game" prior to McCoy's death, but he tried to learn as much

about it as he could after this incident and decided "it was a possibility that that was what happened." (Tr. Vol. II, 158.) Stephens did not explain what the "choking game" entailed.

{¶ 16} Stephens authenticated the document that the camp provides to all the guest groups that come to camp and requires participants to fill out and sign. The form provided for the Church's use of Camp Cotubic and was signed by both Stephens and Mitchell. The form included some general rules for use of the camp, including prohibiting "hazing or initiation behaviors." (Tr. Vol. II, 135.) Once again, the excerpted transcript did not include Stephen's testimony on cross-examination.

{¶ 17} The trial court then allowed the reading of the deposition testimony of Conti, who was unavailable to testify at trial. Conti testified he was a member of the Church, attended Sunday services and twice-weekly youth group meetings, and played in the church band from 6th grade through 12th grade. He said he attended the Church's retreat at Camp Cotubic on April 22, 2006. However, when asked to describe what happened once he got to the camp, Conti responded that "[b]ased on the advice of counsel I assert my rights under the Fifth Amendment of the United States Constitution and respectfully decline to answer the question." (Tr. Vol. II, 215.) Conti gave this same answer when asked what his relationship was with Amoako-Okyere and McCoy. Conti continued to "take the Fifth" for the remainder of his deposition testimony, including when he was asked whether he had a late night conversation with McCoy on the night before he died; whether he gave a statement to detectives of the Logan County Sheriff's Department; whether he ever had a conversation with McCoy or anyone else about doing a prank involving McCoy; whether he participated in a prank on McCoy; whether he participated in a choking prank; whether he discovered McCoy's body; whether it was McCoy's belt wrapped around McCoy's neck; whether he handled McCoy's personal belongings after McCoy's death; whether he wrote any answers in a prayer journal and attached them to a cover page with McCoy's name; whether he had any knowledge of what happened to McCoy's belt; and whether he agreed that the supervisors at the camp did not closely monitor the campers. Conti also "took the Fifth" when asked if he would identify any exhibits, and one final time when asked whether he recanted the statements he made to police officers and others during the time of the church retreat.

{¶ 18} Reverend Stanley Ling, the senior pastor at the Church when McCoy died, testified that Mitchell "followed the safe sanctuary guidelines" when working with the youths in the Church. (Tr. Vol. III, 237.) Reverend Ling described Mitchell as being "exceptionally good at following guidelines and involving and recruiting people that were in the church * * * [that] have gifts for working with young people." (Tr. Vol. III, 237.) The safe sanctuary guidelines provided an adult-to-child ratio for the Church's activities. For the retreat that McCoy participated in, the safe sanctuary guideline recommended a ration of one adult to every seven or eight youths, but Mitchell "always tried to have somewhere around one adult to five or six youth." (Tr. Vol. III, 237.)

{¶ 19} Ling identified the document that announced the youth retreat, and indicated it told campers not to bring any "prank items" with them to Camp Cotubic. (Tr. Vol. III, 257.) Ling did not know, specifically, what was meant by "prank items." Additionally, Ling identified the parent/teen consent form that Amoako-Okyere signed to give her permission for McCoy to attend the retreat. In pertinent part, the consent form stated:

> We (I) do hereby give my permission for my child, James M. McCoy III, to attend and participate in all teen activities and trips sponsored by Church of the Messiah from September 1, 2005 to September 1, 2006.
>
> * * *
>
> We (I) authorize an adult, in whose care my son or daughter has been entrusted to, to consent to any x-ray examination, anesthetic, medical, surgical or dental diagnosis or treatment and hospital care, to be rendered to my son or daughter under the general or special supervision and on the advice of any physician or dentist licensed under the provisions of the Medical Practice Act on the medical staff of a licensed hospital, whether such diagnosis is rendered at the office of said physician or said hospital.
>
> * * *
>
> We (I) further authorize and give permission to Church of the Messiah to furnish my son or daughter any necessary transportation, food and lodging. We (I) give permission for our (my) son or daughter to ride in any vehicle designated by the adult in whose care they have been entrusted while

> attending and participating in all activities sponsored by Church of the Messiah United Methodist.

(Tr. Vol. III, 263-64.)

{¶ 20} When asked about accompanying Mitchell to speak with Amoako-Okyere after McCoy had died, Ling said he remembered the visit but he did not remember the exact words that Mitchell used.  Ling did not remember Mitchell "saying anything about not supervising the young people."  (Tr. Vol. III, 271.)

{¶ 21} A friend of McCoy's, Andi Kelley, testified that she first met McCoy in the seventh grade and the two eventually started dating.  Kelley said McCoy never talked to her about trying to commit suicide or having suicidal thoughts.  Kelley described McCoy as someone who made friends very easily and who was very easy to get along with.  When someone first suggested to Kelley that McCoy's death may have been a suicide, she said that characterization surprised her and his death was "ridiculously unexpected" because they "had plans" for big events in the future, including attending their senior prom and McCoy getting his own car so the two of them would be able to visit each other once they both started college.  (Tr. Vol. IV, 283.)  Kelley did not believe that McCoy committed suicide.  The excerpted transcript does not contain Kelley's testimony on cross-examination.

{¶ 22} On re-direct examination, Amoako-Okyere said her son was committed to the idea of being a minister after he finished college.  Amoako-Okyere said McCoy never attempted suicide or expressed suicidal ideations, and she added that if he had she would have known about it.  She did not believe McCoy committed suicide because of his "character," and his faith taught him that suicide is "an unforgivable sin."  (Tr. Vol. IV, 305-06.)

{¶ 23} Deputy Sheriff Joseph Kopus of the Logan County Sheriff's Office testified that he responded to Camp Cotubic on April 22, 2006, the day McCoy died.  When he arrived at the camp, Kopus spoke with Conti, who informed him that he found McCoy in the woods hanging from a tree.  Conti told him that he used a pocketknife to cut the belt and McCoy fell to the ground.  Kopus said Conti told him he threw the knife he used to cut McCoy down into the pond because "he didn't want the knife he just cut his friend down with."  (Tr. Vol. V, 336.)  Kopus then obtained a statement from Conti.

{¶ 24} Kopus was not the officer who searched the cabin and bunk where McCoy had slept. After examining the scene, Kopus went to the hospital and gave the statements he had obtained from Conti and Anderson to the investigator for the Logan County Coroner. Kopus also obtained a statement from Mitchell in which Mitchell described finding McCoy and performing CPR. Kopus prepared a report of the entire incident and then his involvement in the case was largely finished, though he heard later that some other officers made a trip to Westerville to interview Conti and Anderson and that a journal had been located somewhere among McCoy's property. The detectives who interviewed Conti and Anderson made audio recordings of the interviews, but Kopus was not present when either of those interviews occurred. Further, Kopus had not listened to the audio recordings of the interviews.

{¶ 25} Among the exhibits admitted into evidence was the death certificate issued by the Logan County Coroner. The death certificate listed McCoy's cause of death as asphyxiation due to or as a consequence of hanging. It further listed the manner of McCoy's death as suicide.

{¶ 26} At the close of Amoako-Okyere's case, the Church moved for a directed verdict. Although we do not have the full transcript of proceedings before us, the trial court stated it was "looking at this in the light most favorable to [Amoako-Okyere]" and took "suicide out of this," and that it "looked at this in the light most favorable to [Amoako-Okyere] that this was a prank." (Feb. 26, 2014 Tr. Excerpt, 2.) In a March 5, 2014 decision and entry, the trial court granted the Church's motion for a directed verdict, concluding that, after considering the evidence and construing it most strongly in favor of Amoako-Okyere, the Church "was under no duty to supervise [McCoy] as he was an adult at the time of his death," and that "there was no evidence presented that the injury or harm to [McCoy] was reasonably foreseeable to [the Church]."

{¶ 27} On April 2, 2014, Amoako-Okyere filed a Civ.R. 59(A) motion for new trial, arguing the trial court's judgment was contrary to law and not supported by the weight of the evidence. The trial court denied Amoako-Okyere's motion for new trial in an April 30, 2014 decision and entry. Amoako-Okyere timely appeals both the directed verdict and the denial of her motion for new trial.

## II. Assignments of Error

{¶ 28} Amoako-Okyere assigns the following four assignments of error for our review:

> [1.] The trial court below erred to the prejudice of plaintiff-appellant Tonya Amoako-Okyere by ordering a directed verdict in favor of defendant-appellee Church of the Messiah United Methodist Church.
>
> [2.] The trial court below erred to the prejudice of plaintiff-appellant Tonya Amoako-Okyere by overruling her motion for a new trial.
>
> [3.] The trial court below erred to the prejudice of plaintiff-appellant Tonya Amoako-Okyere by admitting into evidence the death certificate prepared by the Logan County Coroner.
>
> [4.] The trial court below erred to the prejudice of plaintiff-appellant Tonya Amoako-Okyere by excluding from evidence the recorded statements made by Adam Conti to Logan County Sheriff's detectives.

For ease of discussion, we address Amoako-Okyere's assignments of error out of order.

## III. First Assignment of Error – Directed Verdict

{¶ 29} In her first assignment of error, Amoako-Okyere argues the trial court erred when it ordered a directed verdict in favor of the Church.

{¶ 30} When a court considers a motion for a directed verdict, the court must construe the evidence most strongly in favor of the party against whom the motion is directed. Civ.R. 50(A). "A motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 37 (10th Dist.), citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-80 (1998). The court's disposition of the motion does not involve either weighing the evidence or the credibility of the witnesses. *Id.* at ¶ 37, citing *Texler* at 679-80. A court should grant a motion for directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' " *Goodyear Tire & Rubber Co. v.*

*Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3, quoting Civ.R. 50(A)(4).

{¶ 31} By contrast, the court must deny the motion if any evidence of substantial probative value favors the nonmoving party and reasonable minds might reach different conclusions on that evidence. *Reeves* at ¶ 37, citing *Texler* at 679-80; *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-85 (1981). "Because a directed verdict tests only the sufficiency of the evidence, it presents a question of law that appellate courts review de novo." *Reeves* at ¶ 37, citing *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 8 (10th Dist.), citing *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14, and *Goodyear Tire & Rubber Co.* at ¶ 4.

### A. Partial Transcript

{¶ 32} Initially, the Church argues that because Amoako-Okyere did not provide this court with a full transcript of the proceedings in the trial court, we must presume the regularity of the proceedings below and affirm. As we recognized in our recitation of the statement of facts and procedural history, Amoako-Okyere provided this court with a transcript that included only the direct and re-direct testimony of numerous witnesses and did not include cross-examination testimony or the majority of the trial court's discussion of the Church's motion for directed verdict.

{¶ 33} We recognize the general rule that "[w]hen portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). However, pursuant to App.R. 9(B)(1), "it is the obligation of the appellant to ensure that the proceedings *the appellant considers necessary for inclusion in the record * * * are transcribed*." (Emphasis added.) Further, App.R. 9(B) requires "a transcript of proceedings that includes all evidence relevant to the findings or conclusion" when an "appellant intends to present an assignment of error on appeal that a finding or conclusion is *unsupported by the evidence or is contrary to the weight of the evidence*." (Emphasis added.) App.R. 9(B)(4); *Hinkle v. Columbus*, 10th Dist. No. 04AP-1195, 2006-Ohio-1522, ¶ 16.

{¶ 34} As noted above, reviewing a directed verdict does not present factual issues but questions of law only. *Reeves* at ¶ 37. Because a directed verdict tests only the sufficiency of the evidence, it does not involve the weight of the evidence or the credibility of witnesses. *Strother* at 284. This court has recognized that an appellate court can review a directed verdict from a partial transcript that demonstrates the error assigned to the lower court. *See Masdea Ents., Inc. v. The Spaghetti Place, Inc.*, 10th Dist. No. 80AP-231 (June 26, 1980) (stating that "[s]ince the trial court directed a verdict, transcript need include only evidence upon which, when construed most strongly in favor of plaintiffs, reasonable minds could differ upon the issue"). Thus, contrary to the Church's argument, we may consider Amoako-Okyere's assignment of error related to the granting of a directed verdict in view of the partial transcript she has provided to this court.

### B. Existence of a Duty

{¶ 35} To prevail on a wrongful death claim based upon a theory of negligence, a plaintiff must show "(1) the existence of a duty owing to plaintiff's decedent, *i.e.*, the duty to exercise ordinary care, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966), paragraph one of the syllabus. In order for a party to recover damages for wrongful death under a theory of negligence, the party must demonstrate all the elements of negligence. *Whiting v. Ohio Dept. of Mental Health*, 141 Ohio App.3d 198, 202 (10th Dist.2001) Further, " 'negligence is without legal consequence unless it is a proximate cause of an injury.' " *Id.* at 202, quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986).

{¶ 36} In the absence of a duty, no legal liability for negligence can arise. *Smallwood v. MCL, Inc.*, 10th Dist. No. 14AP-664, 2015-Ohio-1235, ¶ 7, citing *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989). The existence of a duty is a question of law for a court to determine. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). "Generally, the existence of a duty depends upon the foreseeability of injury to someone in the plaintiff's general situation." *Smallwood* at ¶ 8, citing *Cromer v. Children's Hosp. Med. Ctr.*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 24. "Injury is foreseeable if a reasonably prudent person would have anticipated that injury was likely to result from the performance or nonperformance of an act." *Id.*, citing *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293 (1997).

{¶ 37} In granting the Church's motion for directed verdict, the trial court first determined the Church did not owe a duty of supervision to McCoy. There is no dispute that Amoako-Okyere proceeded to trial only on a claim of negligent supervision. In her complaint, Amoako-Okyere alleged the Church negligently supervised the youth outing at the camp resulting in McCoy's death. Amoako-Okyere then filed an amended complaint just prior to the start of trial where she again alleged the Church "assumed the duty to supervise this youth camp outing and ensure the safety of [McCoy]," and that the Church "negligently supervised" both McCoy and the other campers allegedly responsible for harming McCoy. (Amended Complaint, ¶ 4, 8.) Indeed, in her motion for new trial filed April 2, 2014, Amoako-Okyere again asserted the Church "had a duty to supervise [McCoy] and all other participants in the church retreat." (Motion for New Trial, 4.) We must first determine, therefore, what duty, if any, the Church owed to McCoy.

{¶ 38} Ruling on the motion for directed verdict, the trial court stated that, in viewing the evidence in the light most favorable to Amoako-Okyere, it would construe McCoy's death to be the result of a prank and not as a result of suicide. Any duty the Church owed to McCoy is then dependent on the foreseeability of the prank. Amoako-Okyere argues that pranking was foreseeable because she received an information sheet from the Church that specifically prohibited campers from bringing "prank items" to the youth retreat. However Amoako-Okyere presented no evidence of prior pranks at the Church, the camp, or by the campers attending the camp. In fact, the evidence presented demonstrated that pranks were specifically prohibited by the Church and the camp. It is hard to imagine how the prohibited conduct could be foreseeable. Even if the evidence that pranks were prohibited made pranks somehow foreseeable, there was no evidence that the so-called "choking game" was the type of prank that fell within the "prank items" described in the flyer, or that anyone at the youth retreat knew of the choking game or could have anticipated that any of the retreat attendees would have participated in the choking game while at Camp Cotubic. Amoako-Okyere does not explain how the Church's prohibiting prank items makes it foreseeable that some campers might engage in a choking game prank.

{¶ 39} Ultimately, the record provided to this court demonstrates that Amoako-Okyere failed to present any evidence that the Church reasonably could have or should

have foreseen the "prank" that led to McCoy's injury and death. Without any indication of foreseeability, the Church could not have had a duty to supervise or protect McCoy, and Amoako-Okyere's negligent supervision claim fails as a matter of law. *Simpson v. Concord United Methodist Church*, 2d Dist. No. 20382, 2005-Ohio-4534, ¶ 25 (stating that "[u]nlike the issue of the proximate cause of an injury, which presents an issue of fact for the jury to determine, foreseeability of harm and the existence of a duty of which foreseeability is an element presents an issue of law for the court to decide"), citing *Mussivand* at 318. Following our independent review of the record in which we construed the evidence in a light most favorable to Amoako-Okyere, we conclude reasonable minds could come to but one conclusion that the "prank" leading to McCoy's death was not foreseeable. Accordingly, the trial court did not err in granting the Church's motion for directed verdict, and we overrule Amoako-Okyere's first assignment of error.

## IV. Third and Fourth Assignments of Error – Evidentiary Rulings

{¶ 40} In her third assignment of error, Amoako-Okyere argues the trial court abused its discretion when it admitted into evidence McCoy's death certificate. In her fourth and final assignment of error, Amoako-Okyere argues the trial court abused its discretion when it excluded from evidence the recorded interview of Conti by detectives from the Logan County Sherriff's Office. Because these assignments of error both concern evidentiary rulings of the trial court, we address them jointly.

{¶ 41} A trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that materially prejudices the affected party. *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. No. 11AP-603, 2012-Ohio-4371, ¶ 73, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001); *State v. Barnes*, 94 Ohio St.3d 21, 23 (2002) (noting a trial court abuses its discretion when it acts "unreasonably, arbitrarily, or unconscionably").

### A. McCoy's Death Certificate

{¶ 42} Amoako-Okyere first argues the trial court erred when it admitted into evidence McCoy's death certificate prepared by the Logan County Coroner. The death certificate listed McCoy's cause of death as asphyxiation due to or as a consequence of hanging. It further listed the manner of McCoy's death as suicide. Amoako-Okyere filed a

motion in limine on February 17, 2014 in an attempt to exclude from evidence the death certificate and other documents which "assert or suggest that [McCoy] killed himself or otherwise died as a result of suicide." During a pretrial hearing on February 19, 2014, the trial court determined that the death certificate was self-authenticating and admissible.

{¶ 43} Pursuant to Evid.R. 803(9), records of vital statistics are not excluded as hearsay. Specifically, the rule allows for "[r]ecords or data compilations, in any form, of births, fetal deaths, deaths, or marriages, if the report thereof was made to a public office pursuant to requirement of law." The death certificate at issue here was signed by the Logan County Coroner and issued in accordance with standard record keeping of vital statistics. Thus, we agree with the trial court that the death certificate was self-authenticating and not excluded as hearsay. *See Vargo v. Travelers Ins. Co., Inc.*, 34 Ohio St.3d 27 (1987), paragraph one of the syllabus (construing R.C. 313.19 and holding "The coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary.").

{¶ 44} Amoako-Okyere argues the trial court nonetheless erred when it admitted the death certificate into evidence because the statements contained in the death certificate required expert testimony, pursuant to Evid.R. 702, in order to be admissible. We need not address this argument, however, because the trial court was explicit that when it considered the Church's motion for directed verdict, it viewed the evidence in the light most favorable to Amoako-Okyere and construed McCoy's death not as a suicide but as a result of a prank. Thus, Amoako-Okyere fails to articulate what harm, if any, stemmed from the trial court's admission into evidence of the death certificate.

{¶ 45} Because the trial court did not abuse its discretion when it admitted McCoy's death certificate into evidence, we overrule Amoako-Okyere's third assignment of error.

### B. Conti's Recorded Interview

{¶ 46} Amoako-Okyere next argues the trial court abused its discretion when it excluded from evidence the recorded interview of Conti by detectives from the Logan County Sherriff's Office. Amoako-Okyere intended to use the recorded interview in

support of her argument that Conti participated in a prank on McCoy that resulted in his death.  The trial court determined the recording of the interview had not been properly authenticated and, thus, it was hearsay that did not fall into any exceptions.

{¶ 47} A statement is inadmissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted.  Evid.R. 801(C) and 802.  There are exceptions to the hearsay rule, however, and those exceptions are listed in Evid.R. 803 and 804.

{¶ 48} Amoako-Okyere argues that Kopus properly authenticated the recording as being part of the supplemental incident report even though Kopus was not the one who conducted the interview or made the recording.  In pertinent part, Evid.R. 901 provides:

> **(A) General provision**. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> **(B) Illustrations**. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> **(1) Testimony of witness with knowledge**.  Testimony that a matter is what it is claimed to be.
>
> * * *
>
> **(7) Public records or reports**.  Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement or data compilation, in any form, is from the public office where items of this nature are kept.

Amoako-Okyere further argues that police incident reports, in general, are public records, so the trial court erred when it excluded the recorded interview from evidence.  *See State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 56 (2001) (holding that an incident report is not a confidential law enforcement investigatory record but is a public record).

{¶ 49} We note that although Kopus testified he brought the audio recording with him in response to a subpoena, he was not the one who made the recording and he had

not listened to it. We need not determine whether the record here indicates that the audio recording of Conti's interview was properly authenticated, however, because the trial court nonetheless properly excluded the contents of the recording as hearsay not within any exception.

{¶ 50} Generally, "[a] police report is hearsay unless it meets one of the exceptions enumerated in the Rules of Evidence." *Muncy v. Am. Select Ins. Co.*, 129 Ohio App.3d 1, 5 (10th Dist.1998), citing *Petti v. Perna*, 86 Ohio App.3d 508, 513 (3d Dist.1993). The firsthand observations of the official making the report fall within the public records exception to the hearsay rule and are admissible. *Id.*, citing *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.*, 41 Ohio App.3d 239, 242 (10th Dist.1987). However, hearsay statements contained in a police report that do not have an independent source of admissibility are inadmissible under Evid.R. 803(8). *Cincinnati Ins. Co.* at 242 (noting that statements contained in a police report made by private citizens or a person outside the official agency creates an issue of multiple hearsay).

{¶ 51} Here, Amoako-Okyere did not seek to admit a law enforcement officer's firsthand observations, but instead sought to admit the statements of Conti, and she sought to admit those statements to prove the truth of the matter asserted. Conti was unavailable to testify at trial, and Amoako-Okyere does not point to an exception to the hearsay rule that would make his statements admissible. Thus, because the recorded Conti interview was hearsay not within any exception, the trial court did not abuse its discretion in excluding the recorded interview from evidence. We overrule Amoako-Okyere's fourth assignment of error.

## V. Second Assignment of Error – Motion for New Trial

{¶ 52} In her second assignment of error, Amoako-Okyere argues the trial court abused its discretion when it denied her motion for new trial.

{¶ 53} As is relevant here, Civ.R. 59(A) provides that a court may grant a motion for new trial upon any of the following grounds:

> (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

> (7) The judgment is contrary to law;

* * *

> (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

{¶ 54} The decision to grant or deny a motion for new trial, pursuant to Civ.R. 59, lies within the sound discretion of the trial court, and an appellate court will not reverse that decision absent an abuse of discretion. *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312 (1995). An "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 55} Amoako-Okyere's argument in support of her second assignment of error is a restatement of the arguments she made in her first, third, and fourth assignments of error. More specifically, Amoako-Okyere argues that the trial court erroneously granted a directed verdict and abused its discretion in making its evidentiary rulings. According to Amoako-Okyere, any of these reasons or a combination of the three is sufficient to warrant a new trial. However, having already determined in our disposition of Amoako-Okyere's first, third, and fourth assignments of error that the trial court did not err in granting a directed verdict or abuse its discretion in making its evidentiary rulings, these arguments similarly fail to support Amoako-Okyere's motion for new trial. Accordingly, the trial court did not abuse its discretion in denying Amoako-Okyere's motion for new trial, and we overrule Amoako-Okyere's second assignment of error.

## VI. Disposition

{¶ 56} Based on the foregoing reasons, the trial court did not err in granting the Church's motion for directed verdict, and the trial court did not abuse its discretion in denying Amoako-Okyere's motion for new trial or in making its evidentiary rulings. Having overruled Amoako-Okyere's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

_____