[Cite as *McKeny v. Ohio Univ.*, 2017-Ohio-8589.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Timothy Scott McKeny, Ph.D., | : | |
| Plaintiff-Appellant, | : | No. 17AP-392 |
| | | (Ct. of Cl. No. 2014-00984) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio University, | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on November 16, 2017

**On brief:** *Farlow & Associates, LLC, Beverly J. Farlow, Paul F. Rogers*, and *Zachary S. Gwin*,  for appellant. **Argued:** *Zachary S. Gwin.*

**On brief:** *Michael DeWine*, Attorney General, *Randall W. Knutti, Richard N. Coglianese,* and *Erin E. Butcher*, for appellee.  **Argued:** *Randall W. Knutti.*

APPEAL from the Court of Claims of Ohio

LUPER SCHUSTER, J.

{¶ 1}  Plaintiff-appellant, Timothy Scott McKeny, Ph.D., appeals from a judgment entry of the Court of Claims of Ohio rendering judgment in favor of defendant-appellee, Ohio University ("OU") on McKeny's breach of contract and contractual due process claims.  For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2}  In 2006, OU hired McKeny as an assistant professor in the Department of Teacher Education in a "tenure track" position.  Pursuant to the April 28, 2006 letter offering McKeny employment, McKeny's position on the OU faculty was subject to a probationary period not to exceed seven years, and OU would conduct McKeny's tenure

review in the 2011-2012 academic year. Any tenure granted to McKeny would become effective the beginning of the year following his successful tenure review. On October 31, 2007, McKeny confirmed in writing that OU would make his tenure decision no later than June 30, 2012 and that his probationary period would end on June 30, 2013.

{¶ 3} The OU Faculty Handbook ("the handbook") details the standards candidates for tenure must meet. The handbook states at II(C)(6)(a) that "[t]enure is awarded to those individuals whose records indicate that they are likely to continue to make significant positive contributions to the academic life of the University throughout their professional careers." (Pl.'s Dep. Ex. 15, Handbook at 21.) If OU does not intend to retain a faculty member past the probationary period, the handbook requires OU to provide written notification at least one year before the end of the probationary period. The handbook requires department chairs to evaluate annually each probationary faculty using the department's criteria for promotion and tenure. However, the handbook explicitly states that "[a]lthough these evaluations may be indicators of progress toward tenure and promotion, favorable annual reports do not guarantee positive tenure or promotion decisions." (Pl.'s Dep. Ex. 15, Handbook II(E)(3)(a) at 32.)

{¶ 4} The handbook further states "[a]ll awards of tenure and all promotions in rank must originate in a positive recommendation by the appropriate departmental committee or after a formal hearing and presidential review in cases that have gone through the grievance procedure as in Section II.F." (Pl.'s Dep. Ex. 15, Handbook II(E)(5) at 32.) The chair of the departmental promotion and tenure committee must put the department's recommendation in writing, and, if the recommendation is to grant tenure, the chairperson then forwards the committee's recommendation to the dean along with the chairperson's personal recommendation.

{¶ 5} If the dean rejects the department's recommendation, he or she must inform the committee in writing along with an explanation of why the dean did not accept the recommendation. A dean's rejection of a tenure recommendation ends the process unless the faculty member appeals the dean's decision. A faculty member must originate an appeal at the level at which the adverse decision was made "either within the department, or at the level of the dean or of the Executive Vice President and Provost." (Pl.'s Dep. Ex. 15, Handbook II(F)(1) at 34.) Further, "[s]hould the appeal be denied at

any of these levels, the faculty member may take the appeal to the next level."  (Pl.'s Dep. Ex. 15, Handbook II(F)(1) at 35.)  The "levels" of appeal include the department, the dean, the provost, the Senate Standing Committee on Promotion and Tenure of the OU Faculty Senate (the "Standing Committee"), and ultimately the president, who makes the "final decision."  (Pl.'s Dep. Ex. 15, Handbook II(F)(7)(g) at 39.)

{¶ 6}  In November 2011, McKeny submitted a tenure and promotion dossier to his department's promotion and tenure committee. Both the committee and the department chair recommended to the dean of OU's College of Education and Human Services ("College of Education") that OU award McKeny tenure.  However, the dean of the College of Education, Renée Middleton, denied McKeny's application for promotion and tenure, finding that while McKeny's teaching and outreach had been "exemplary," McKeny had too few publications and an insufficient record of sustained scholarship. (Pl.'s Dep. Ex. 41 at 3.)  McKeny's dossier listed only one published monograph and one published peer-reviewed article, with several more "in review" or "in press."  (Pl.'s Dep. Ex. 29.)

{¶ 7}  McKeny appealed Dean Middleton's denial of his tenure application, asserting that since the time he submitted his tenure dossier, he had more potential publications in the review process.  In a June 8, 2012 letter, Dean Middleton denied his appeal, again noting his lack of scholarship.  Dean Middleton noted that in McKeny's first faculty evaluation in 2007, it was "strongly recommended" that he work in the area of referred journals rather than grant work.  (Pl.'s Dep. Ex. 45 at 1.)  Additionally, in 2010, the tenure and promotion committee informed McKeny his scholarship did not meet expectations.  In denying his appeal, Dean Middleton stated "[t]he body of your work you are submitting is either under review, or in press," and noted that although McKeny demonstrated a "flurry of activity" in 2011, he nonetheless exhibited a lack of sustained scholarship throughout his probationary period with OU.  (Pl.'s Dep. Ex. 45 at 4.)

{¶ 8}  On September 4, 2012, McKeny appealed Dean Middleton's decision denying his appeal to OU's provost, Pam Benoit.  Provost Benoit also denied McKeny's appeal, finding no evidence of inadequate consideration or of due process violations. McKeny appealed from the provost's decision on November 14, 2012 to the Standing Committee.  The Standing Committee endorsed McKeny's appeal and returned the case to

Dean Middleton for reconsideration. However, on January 28, 2013, Dean Middleton denied McKeny's reconsidered appeal, again reiterating the lack of sustained scholarship.

{¶ 9} McKeny appealed from Dean Middleton's third denial of his appeal to the Standing Committee on February 20, 2013, and the Standing Committee referred the matter to Provost Benoit. In an April 29, 2013 letter, Provost Benoit denied McKeny's appeal, concluding Dean Middleton "acted within her purview on the issue of college research expectations and that there is not sufficient evidence to suggest that your bid for tenure and promotion was subject to inadequate consideration in the area of scholarly productivity." (Pl.'s Dep. Ex. 55.) Following Provost Benoit's denial of his appeal, the Standing Committee granted McKeny a hearing before a Special Senate Committee of faculty.

{¶ 10} The Special Senate Committee conducted a hearing on October 24, 2013 and recommended, in a November 1, 2013 letter, that McKeny's appeal be upheld and he be granted tenure and promotion. In its decision, the Special Senate Committee noted that the "only binding document governing tenure and promotion is the department's Policy 60.111." (Pl.'s Dep. Ex. 59, Hearing Report at 2.) The Special Senate Committee determined Policy 60.111 defines "scholarship" more broadly than Dean Middleton, who relied solely on publication to assess scholarship.

{¶ 11} Pursuant to section II(F) of the handbook, the Special Senate Committee made its recommendation to OU's president, Roderick J. McDavis, for a final determination on McKeny's appeal. However, in a November 26, 2013 letter, President McDavis denied McKeny's appeal. President McDavis noted McKeny had been repeatedly advised throughout his time at OU that he needed a stronger record of journal publications, and President McDavis concluded that the department's emphasis on the importance of peer-reviewed publications is not inconsistent with Dean Middleton's assessment of his scholarship. President McDavis also noted that the two outside reviewers nominated by the Tenure and Promotion Committee both recommended against granting McKeny tenure due to his insufficient level of scholarship. In a December 20, 2013 letter to the chair of the Faculty Senate, President McDavis indicated he again reviewed the materials related to McKeny's appeal and stated he is "standing by [his] original decision to deny the appeal." (Pl.'s Dep. Ex. 61 at 3.)

{¶ 12} On December 18, 2014, McKeny filed a complaint with the Court of Claims of Ohio against OU asserting claims of breach of contract, violation of contractual due process, sexual orientation discrimination, violations of R.C. 4112.02 and 4112.99, interference with prospective advantage, civil conspiracy, and infliction of emotional distress. The claims all related to OU's denial of McKeny's application for promotion and tenure. Along with his complaint, McKeny filed a motion requesting a hearing to determine whether Dean Middleton, Provost Benoit, and President McDavis were entitled to statutory immunity. That same day, McKeny also filed a related complaint in the United States District Court for the Southern District of Ohio against OU, Dean Middleton, Provost Benoit, and President McDavis alleging violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1983.

{¶ 13} Following an immunity hearing on October 1 and 2, 2015, the Court of Claims, in an October 23, 2015 decision, denied McKeny's motion to strip Dean Middleton, Provost Benoit, and then-President McDavis of their statutory civil immunity, concluding "that the evidence is clear and unambiguous that Dean Middleton, Provost Benoit, and President McDavis were acting within the scope of their employment in their decisions to deny [McKeny] tenure." (Oct. 23, 2015 Decision at 4.) Thus, the Court of Claims stated it does not have jurisdiction over any civil actions that may be filed against Dean Middleton, Provost Benoit, and President McDavis based on the allegations in McKeny's case. The parties stipulated that the sworn testimony taken in the immunity hearing would be combined with any testimony taken in the hearing on the merits.

{¶ 14} The parties then filed cross-motions for summary judgment. In a December 6, 2016 entry, the Court of Claims dismissed McKeny's claims for interference, civil conspiracy, and infliction of emotional distress, finding there are no genuine issues of material fact as to those claims. However, the Court of Claims determined there remained genuine issues of material fact regarding McKeny's contract and discrimination claims.

{¶ 15} The Court of Claims then conducted a hearing on the merits of McKeny's remaining claims against OU on December 12, 13, and 14, 2016. At the beginning of the hearing, the Court of Claims granted OU's motion to exclude the expert testimony of Heinz Ickert, stating it would take judicial notice of mathematical formulas and present values of McKeny's pension and the statutory life expectancy tables. Upon the motion of

OU at the close of the trial, the Court of Claims dismissed McKeny's discrimination claims.

{¶ 16} The parties filed closing briefs on McKeny's remaining claims of breach of contract and violation of contractual due process. In an April 24, 2017 decision, the Court of Claims concluded that OU's "decision to deny [McKeny's] tenure was not made in bad faith, arbitrary, or capricious," and that McKeny "produced no evidence to support a violation of due process claim." (Apr. 24, 2017 Decision at 5.) Thus, the Court of Claims found that "the decisions by the Dean, Provost, and President, although contrary to the faculty committee's recommendation and what [McKeny] had hoped for, were compliant with [OU's College of Education policy governing tenure and promotion applications] and not a breach." (Apr. 24, 2017 Decision at 5.) The Court of Claims entered judgment in favor of OU and assessed costs against McKeny in an April 24, 2017 judgment entry. McKeny timely appeals.

## II. Assignments of Error

{¶ 17} McKeny assigns the following errors for our review:

[1.] The trial court erred as a matter of law and fact in finding that the decision of the dean, provost, and president, were compliant with policy and Ohio University did not breach its contractual obligations to Dr. McKeny.

[2.] The trial court erred as a matter of law and fact in finding that Ohio University's decision to deny tenure was not made in bad faith, arbitrary, or capricious.

[3.] The trial court erred as a matter of law and fact in failing to find a substantial departure from accepted academic norms.

[4.] The trial court erred as a matter of law and fact in finding that no evidence was produced to support a violation of due process claim.

[5.] The trial court erred as a matter of law and fact in failing to consider terms of the contract within the faculty handbook.

[6.] The trial court abused its discretion in excluding McKeny's expert witness.

[7.] The trial court erred as a matter of law in refusing to admit testimony and exhibit 180 which pertained to codified college of education tenure guidelines.

[8.] The trial court erred as a matter of law in refusing to admit exhibits 195-201 and testimony pertaining to documents on Ohio University's website.

## III.  First, Second, Third, Fourth, and Fifth Assignments of Error – Legal and Factual Conclusions

{¶ 18} McKeny's first five assignments of error are interrelated and we address them jointly.  In his first, second, third, fourth, and fifth assignments of error, McKeny argues the Court of Claims erred in both its legal conclusions and factual findings supporting those conclusions when it entered judgment in favor of OU on the contract claims.  More specifically, these five assignments of error implicate the interpretation of a written contract and the manifest weight of the evidence.

### A.  Standard of Review and Applicable Law

{¶ 19} The construction and interpretation of written contracts involves issues of law that an appellate court reviews de novo.  *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus.  The purpose of contract construction is to realize and give effect to the parties' intent.  *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus.  "[T]he intent of the parties to a contract resides in the language they chose to employ in the agreement."  *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992).  When " 'the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.' "  *Holdeman v. Epperson*, 111 Ohio St.3d 551, 2006-Ohio-6209, ¶ 12, quoting *Shifrin* at 638.

{¶ 20} In civil cases, a reviewing court will not reverse the judgment as being against the manifest weight of the evidence if some competent, credible evidence supports all the essential elements of the case.  *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).  In determining whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trial court are correct.  *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  "The underlying rationale of giving deference to the findings of the trial court rests with the

knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*

### B. Breach of Contract

{¶ 21} McKeny argues the Court of Claims erred when it concluded OU did not breach its contract with McKeny when it denied his application for tenure and promotion. To succeed on a claim of breach of contract, a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages or loss to the plaintiff. *Thyssen Krupp Elevator Corp. v. Constr. Plus, Inc.* 10th Dist. No. 09AP-788, 2010-Ohio-1649, ¶ 13, citing *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.).

{¶ 22} The parties agree that a contract exists between McKeny and OU stemming from the handbook and department Policy 60.111. The Court of Claims stated that because the College of Education did not have its own criteria for granting tenure at the time of McKeny's application, the only binding document governing McKeny's tenure and promotion application was the department's Policy 60.111, which was a supplement to the handbook. The "Procedures, Criteria and Worksheet for Evaluating Tenure and Promotion for Group I Faculty by [Tenure and Promotion] Committee" contained in Policy 60.111 provides:

> Scholarship is broadly conceptualized in three distinct areas: the Scholarship of Discovery, Integration, and Teaching. * * * Scholarship includes such activities as research, publications, the delivery of papers and other invited presentations in professional settings; plus curriculum/product development including software, multimedia forms, and testing/evaluation instruments. The scholar shares his or her research findings individually or collaboratively with professional peers and in so doing subjects such findings to peer evaluation and criticism.

(Pl.'s Dep. Ex. 13, Policy 60.111 at 1-2.) Further, under the heading "Expectations for Scholarship," Policy 60.111 further provides:

> Expectations for **TENURE** require invited and/or peer-reviewed products of scholarship of discovery, integration

> and/or teaching that result in dissemination to an identifiable audience.

(Emphasis sic.)  (Pl.'s Dep. Ex. 13, Policy 60.111 at 7.)

{¶ 23} McKeny relies on the broad conceptualization of scholarship outlined in Policy 60.111 to assert that OU breached its contract with him when it denied his application for tenure based on a lack of sustained scholarship.  McKeny asserts Dean Middleton failed to follow the guidelines of Policy 60.111 and instead employed her own subjective judgment as to whether to grant McKeny tenure.

{¶ 24} In essence, McKeny argues Dean Middleton, and President McDavis's subsequent adoption of her reasoning, erroneously placed too much emphasis on his lack of peer-reviewed publications in denying his application for tenure.  However, we agree with the Court of Claims that the plain language of Policy 60.111 places an emphasis on the importance of peer-reviewed publications in determining whether a faculty member obtains tenure.  Further, to the extent McKeny argues Dean Middleton used her own subjective judgment of which he had no notice, we note that the process of evaluating a candidate for tenure, as outlined in the handbook and Policy 60.111, is inherently subjective.  *See Saha v. Ohio State Univ.*, 10th Dist. No. 10AP-1139, 2011-Ohio-3824, ¶ 38 (stating a court uses its own judgment when interpreting a contract, but in a case alleging breach of contract due to failure to award tenure, a court properly gives deference to a university "when faculty members used their subjective judgment when they evaluated" whether an applicant should obtain tenure).

{¶ 25} The record indicates that on separate occasions in 2007, 2009, 2010, and 2011, the members of the department instructed McKeny to place more emphasis on refereed and peer-reviewed journals in order to improve his likelihood of obtaining tenure.  Under the terms of the handbook, the dean is under no obligation to accept the department's recommendation for tenure and instead engages in a separate evaluation of the application.  It is notable that McKeny's own witnesses agreed that OU's tenure procedures allowed Dean Middleton to make her own subjective determination of McKeny's tenure application.

{¶ 26} Ultimately, the handbook places the final decision on a denial of tenure with the university president.  The handbook does not place any restrictions on the discretion

of the president in granting or denying an appeal on a denial of tenure. Here, President McDavis reviewed McKeny's entire file, including his dossier and application and the record from the many stages of his appeal. Reviewing all of that information, President McDavis affirmed Dean Middleton's denial of McKeny's application for tenure. We agree with the Court of Claims that the decisions of the dean, provost, and president are all compliant with Policy 60.111 and the handbook and thus do not constitute a breach. Though the decisions of the dean, provost, and president are contrary to the faculty committee's recommendation, the plain language of the handbook allows for the faculty committee to arrive at a different outcome than the dean, provost, and president.

{¶ 27} McKeny also argues the Court of Claims erred in concluding the university's decision was not made in bad faith, arbitrary, or capricious. "As a general rule, courts defer to the academic decisions of colleges and universities unless there has been 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' " *Saha* at ¶ 36, quoting *Bleicher v. Univ. of Cincinnati College of Med.*, 78 Ohio App.3d 302, 308 (10th Dist.1992). Here, the university followed its own process, as outlined in the handbook, in evaluating McKeny's application for tenure. That process plainly reserves independent and professional judgment at the different levels of review. The record demonstrates that the decision was made carefully and was heard at many levels of the university's hierarchy. Though McKeny does not like the outcome, the fact that Dean Middleton, Provost Benoit, and President McDavis all disagreed with the recommendations of the faculty committee and the senate committee do not render their decisions in bad faith, arbitrary, or capricious. The decisions of Dean Middleton and President McDavis are in alignment with the guidance provided in Policy 60.111 in evaluating applications for tenure. Thus, we do not agree with McKeny that the decision to deny his application for tenure was made in bad faith, arbitrary, or capricious.

### C. Breach of Contractual Due Process

{¶ 28} McKeny also argues the Court of Claims erred in concluding there was no breach of McKeny's contractual due process. McKeny asserts OU did not adequately follow its own grievance procedure in evaluating his application for tenure and his many appeals. However, as we noted above, OU followed the grievance process as it is outlined

in the handbook in handling McKeny's appeals.  Though McKeny attempts to seize on key words from the various written decisions made by the dean, provost, and president, isolating those words from their context, we agree with the Court of Claims that McKeny produced no evidence to support a violation of due process claim.

{¶ 29} Thus, we agree with the Court of Claims that OU did not breach its contract with McKeny when it denied his application for tenure.  Accordingly, we overrule McKeny's first, second, third, fourth, and fifth assignments of error.

## IV.  Sixth, Seventh, and Eighth Assignments of Error – Evidentiary Rulings

{¶ 30} McKeny's sixth, seventh, and eighth assignments of error are interrelated and we address them jointly.  In his sixth assignment of error, McKeny argues the Court of Claims erred in excluding his expert witness.  In his seventh assignment of error, McKeny argues the Court of Claims erred in refusing to admit documents related to the College of Education's tenure guidelines.  Finally, in his eighth assignment of error, McKeny argues the Court of Claims erred in refusing to admit documents obtained from the university's website. Taken together, these assignments of error challenge the Court of Claims' evidentiary rulings.

{¶ 31} Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion.  *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299 (1992).  An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### A.  Expert Witness

{¶ 32} McKeny argues the Court of Claims erred when it granted OU's motion to exclude the testimony of McKeny's expert witness, Heinz Ickert.  Three business days before the start of the trial, McKeny identified Ickert as an expert witness and included Ickert's expert report.  Pursuant to L.C.C.R. 7(E), supplemental reports of an expert witness "must be supplied no later than thirty days prior to trial."  The local rule also gives discretion to the Court of Claims to exclude the testimony of the expert if the party does not provide a report and does not demonstrate good cause for its failure to provide a report.  L.C.C.R. 7(E).

{¶ 33} McKeny does not demonstrate that the Court of Claims abused its discretion when it enforced the local rule as written. *See Am. Hotel Group, LLC v. Wyandotte Plaza, LLC*, 10th Dist. No. 16AP-296, 2017-Ohio-5520, ¶ 16 (finding no abuse of discretion in the trial court enforcing as written its local rule pertaining to requests for a jury trial). The Court of Claims noted McKeny had previously represented he did not have any expert witnesses. Additionally, although the Court of Claims excluded Ickert's expert testimony, it took judicial notice of the mathematical formulas and present values upon which Ickert relied. Accordingly, the Court of Claims did not abuse its discretion in enforcing L.C.C.R. 7(E) and not permitting McKeny to present expert testimony where McKeny waited until three business days before the start of trial to disclose his expert witness. We overrule McKeny's sixth assignment of error.

### B. Exclusion of Exhibits

{¶ 34} In his seventh and eighth assignments of error, McKeny argues the Court of Claims erred in refusing to admit various documents into evidence.

{¶ 35} Exhibit No. 180 contained policies and procedures related to granting tenure the university enacted after McKeny had left OU. The Court of Claims determined that exhibit No. 180 was not relevant.

{¶ 36} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 402 states "[e]vidence which is not relevant is not admissible." The Court of Claims determined that because exhibit No. 180 outlined the tenure policies OU had adopted *after* McKeny had left the university, the document was not relevant to determining whether OU breached its contract with McKeny. We agree. The policies contained in exhibit No. 180 did not apply to McKeny or his application for tenure, and, thus, they were not relevant. Accordingly, the Court of Claims did not abuse its discretion in refusing to admit exhibit No. 180 into evidence. We overrule McKeny's seventh assignment of error.

{¶ 37} McKeny also asserts the Court of Claims erred in refusing to admit exhibit Nos. 195-201. The documents contained in these exhibits came from OU's website. The Court of Claims determined these documents did not satisfy the business records exception to the hearsay rule contained in Evid.R. 803 and thus excluded the documents.

{¶ 38} We need not determine whether the Court of Claims erroneously determined the documents obtained from OU's website were inadmissible hearsay because McKeny is unable to demonstrate any prejudice from the exclusion of this evidence. McKeny sought to use the documents contained in exhibit Nos. 195-201 to establish what his salary would have been had he not been terminated. This evidence was arguably relevant to any damages McKeny may have suffered. However, as we explained in our resolution of McKeny's first five assignments of error, the Court of Claims did not err in concluding OU did not breach its contract with McKeny. Because there was no breach of contract, it is immaterial what damages, if any, McKeny may have suffered. Accordingly, McKeny does not demonstrate any prejudice from the Court of Claims' evidentiary ruling in this regard. *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 10th Dist. No. 14AP-441, 2015-Ohio-3841, ¶ 41 ("A trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion *that materially prejudices* the affected party."). (Emphasis added.)

{¶ 39} We overrule McKeny's eighth and final assignment of error.

## V. Disposition

{¶ 40} Based on the foregoing reasons, the Court of Claims did not err in concluding OU did not breach its contract with McKeny and that OU did not violate McKeny's contractual due process rights, and the Court of Claims did not abuse its discretion in its evidentiary rulings. Having overruled McKeny's eight assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

TYACK, P.J., and SADLER, J., concur.

_____