[Cite as *In re E.B.*, 2025-Ohio-1999.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| E.B. et al. | : | No. 24AP-474 |
| | | (C.P.C. No. 16JU-15064) |
| (R.B., Father, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| E.B. et al. | : | No. 24AP-490 |
| | | (C.P.C. No. 16JU-15064) |
| (M.S., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on June 5, 2025

**On brief:** *David K. Greer* for appellant R.B.

**On brief:** *William T. Cramer* for appellant M.S.

**On brief:** *Jessica M. Ismond* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1} Appellants, R.B. (father of E.B. and B.B.) and M.S. (mother of E.B. and B.B.), appeal from a decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating their parental rights and

placing the children in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} This case involves FCCS's request for permanent custody of E.B., who was born on September 28, 2010, and B.B., who was born on March 6, 2013. Originally, FCCS filed a complaint on June 28, 2016. The case expired by operation of law, and FCCS filed a refiled complaint on September 21, 2016. The second complaint again expired by operation of law. FCCS then filed a third and final complaint on December 19, 2016, alleging E.B. and B.B. to be abused, neglected, and dependent children. The third complaint alleged the children were present when mother's boyfriend was selling heroin from the kitchen of their home. At the time of the third complaint, father's whereabouts were unknown.

{¶ 3} The trial court issued a temporary order of custody ("TOC") to father on December 20, 2016. The trial court ordered father to complete random drug screens. At a February 6, 2017 hearing, the trial court adjudicated E.B. and B.B. to be abused, journalizing the finding in a February 10, 2017 judgment entry. The trial court ordered the complaint to be amended to reflect that father was at Alvis House, a residential substance abuse treatment facility, at the time of the filing. In the judgment entry, the trial court granted father temporary court commitment ("TCC") of the children and ordered FCCS to provide protective supervision. Thereafter, the trial court approved and adopted a case plan for mother and father.

{¶ 4} On April 6, 2017, FCCS filed a shelter care motion to terminate father's TCC. The motion alleged father was misusing opioids, kept marijuana in his bedroom, and was buying opioids for mother. Additionally, the motion alleged father was slumped over and passed out while the children were running around and that he was not complying with the required drug screens. On July 10, 2017, the trial court dismissed the motion for a change in circumstances.

{¶ 5} FCCS filed another motion to modify orders on October 2, 2017, alleging father was allowing the children to stay with their maternal great-grandmother where mother also lived. The motion alleged mother had "choked out" the children. (Oct. 10,

2017 Shelter Care Mot. at 2.) On October 23, 2017, the trial court ordered that mother's visits be supervised and for father to complete a drug screen.

{¶ 6} On November 9, 2017, FCCS filed another shelter care motion, this time requesting TCC of the children. The motion alleged father appeared to be under the influence during a visit with the FCCS caseworker, had not completed any drug screens in recent weeks, and was allowing the children to have unsupervised visits with mother. The trial court granted FCCS a TOC of the children on November 14, 2017 and ordered the parents' visits to be supervised.

{¶ 7} A few weeks later, on December 11, 2017, the trial court granted TCC of the children to J.T., the children's maternal great-grandmother. On January 22, 2019, after two extensions of TCC in February and August of 2018, FCCS filed a motion for legal custody of the children to J.T. The magistrate conducted a hearing on March 11, 2019 and awarded legal custody to J.T. in a March 20, 2019 decision. Father objected to the magistrate's decision, and the trial court denied the objections and adopted the magistrate's decision in an August 13, 2019 decision and entry.

{¶ 8} The children lived with J.T. until December 18, 2021 when J.T. died. On January 10, 2022, T.T., the children's second cousin, filed a motion for custody. The trial court awarded T.T. a TOC on January 14, 2022. Mother filed her own motion for custody on February 14, 2022. The trial court conducted a preliminary hearing on February 16, 2022, maintaining the TOC to T.T. and giving FCCS a temporary order of protective supervision.

{¶ 9} On April 1, 2022, FCCS filed a shelter care motion alleging the children no longer wanted to live with T.T. T.T. agreed to allow FCCS temporary custody of the children. FCCS could not identify any additional kinship care placements, and the children were placed in foster care. The trial court awarded a TOC of the children to FCCS on April 5, 2022 and ordered the parents' visits to be supervised. On April 19, 2022, FCCS filed findings of fact in support of its reasonable efforts toward reunification. The trial court then conducted a hearing before a magistrate on August 31, 2022 and granted TCC to FCCS. The trial court journalized the TCC in a September 19, 2022 entry. A new case plan for father and mother was filed on September 8, 2022.

{¶ 10} FCCS then filed a motion for permanent court commitment ("PCC") of the children on March 2, 2023. Following a May 16, 2023 hearing, the trial court extended the TCC for six months. (June 16, 2023 Jgmt. Entry.) On August 8, 2023, FCCS filed findings of fact in support of its reasonable efforts to implement a permanency plan. Subsequently, on August 30, 2023, FCCS filed a second motion for PCC. The second motion additionally alleged the children had been in agency custody for 12 or more months of a consecutive 22-month period.

{¶ 11} Father filed a motion for an in-camera interview of the children. (April 18, 2024 Mot.) During the in-camera interview, E.B. stated she wanted to be adopted, but B.B. said he wanted to be reunified with his father. In response to the different wishes expressed by the children, the trial court appointed separate counsel for each child. (May 29, 2024 Tr. at 84-86.)

{¶ 12} Ultimately, the matter came for trial on the PCC motion on May 28 and 29, 2024. At the beginning of trial, father's counsel requested another in-camera interview of the children, but the trial court denied the request. (May 28, 2024 Tr. at 8-12.) Mother waived her presence at the hearing due to her incarceration.

{¶ 13} Father testified that he was living in his truck at the time of trial. (May 28, 2024 Tr. at 26.) Father stated he has two other children in addition to E.B. and B.B. who do not reside with him. (May 28, 2024 Tr. at 27.) Father testified FCCS had given him a case plan that required him to obtain housing, complete an alcohol and drug assessment, attend parenting classes, complete a mental health evaluation, and complete random drug screens. (May 28, 2024 Tr. at 31-32.) Father stated he completed parenting classes and a mental health assessment, though he was unsure whether he had completed all recommendations accompanying the mental health assessment. (May 28, 2024 Tr. at 33-34.) From the mental health assessment, father was diagnosed with severe depression and severe anxiety disorder. (May 28, 2024 Tr. at 35.) Father was prescribed medication for his anxiety and depression but never filled the prescription. (May 28, 2024 Tr. at 35.) He testified he spent time in an in-patient addiction recovery program from April to July 2023 and participated in some outpatient addiction recovery programming until his insurance would no longer cover the treatment. (May 28, 2024 Tr. at 35-37.) Father testified he has not been diagnosed with opioid use disorder but he received a vivitrol shot for opioid

treatment in August 2023. (May 28, 2024 Tr. at 37-38.) Father said the FCCS caseworker reminded him throughout the pendency of the case that he needed to complete his mental health treatment but that he has not attended the recommended follow-up appointments. (May 28, 2024 Tr. at 38-39.) When asked whether he had ever taken illegal substances to cope with mental health or emotional problems, father responded "I plead the Fifth." (May 28, 2024 Tr. at 39.)

{¶ 14} Father testified the last time he completed a drug screen was in September 2023 when he called the FCCS caseworker to ask for help finding housing. (May 28, 2024 Tr. at 44-45.) The caseworker provided father the phone number for a homeless shelter where father said he was placed on a waiting list. (May 28, 2024 Tr. at 45.) Father said he had not completed a drug screen since September because he spends every day trying to figure out how to work or get money and find a place to live. (May 28, 2024 Tr. at 46.) When FCCS suggested that father could complete a hair follicle test instead of random drug screens, father said he refused. (May 28, 2024 Tr. at 46-47.) Father testified the FCCS caseworker tried to work with him to reschedule drug screens at times that were better for his schedule, but the caseworker was not able to offer anything that worked for him. (May 28, 2024 Tr. at 47-48.)

{¶ 15} Father was working for a friend's construction company and his brother's home renovation company earning approximately $1,600 per month. (May 28, 2024 Tr. at 48-49.) He testified he has applied for other positions, but his criminal record has prevented him from getting a different job. (May 28, 2024 Tr. at 51.) Father said he received referrals to housing assistance from FCCS but that he did not qualify for assistance because "they said that [he] would have to have proof of custody of [his] kids and Social Security cards and birth certificates." (May 28, 2024 Tr. at 52-53.) FCCS provided father with low-income housing resources and a list of second-chance housing, but father said of the 17 potential places he contacted, 11 denied his application and 6 had phone numbers that were out of service. (May 28, 2024 Tr. at 55-56.) Ten days prior to the start of trial, Father said he applied for housing and was waiting to hear whether his application would be approved. (May 28, 2024 Tr. at 57-58.) Father said his criminal record was the biggest barrier to obtaining housing, and he has not had housing since he was released from prison in 2016. (May 28, 2024 Tr. at 58.) He acknowledged that if the children were returned to

him the day of the hearing, they would not have a home to go to. (May 28, 2024 Tr. at 66.) Additionally, father stated he believed both of his children wanted to live with him if he could obtain housing. (May 28, 2024 Tr. at 77.)

{¶ 16} Father testified he regularly attends visits with the children at the agency for two hours a week. (May 28, 2024 Tr. at 63.) He brings games to play with the children and they go outside to throw a football together. (May 28, 2024 Tr. at 64.) Father described the children as happy to see him, and he testified he has telephone contact with them every day. (May 28, 2024 Tr. at 64.) He also attends all of B.B.'s sports games. (May 28, 2024 Tr. at 64.) Father did not know where the children attended school because, he said, no one is allowed to tell him. (May 28, 2024 Tr. at 65.) Father was not aware of any education assistance the children needed or were receiving. (May 28, 2024 Tr. at 65.)

{¶ 17} Kiana Wade, a caseworker at FCCS, testified she has been assigned to E.B.'s and B.B.'s case since February 2022. (May 28, 2024 Tr. at 82.) Ms. Wade testified the children were previously in the custody of their maternal great-grandmother until her death in December 2021, at which time the children were placed in kinship care with a maternal cousin. (May 28, 2024 Tr. at 83.) FCCS eventually received custody of the children in April 2022 after the children refused to stay in the kinship care placement. (May 28, 2024 Tr. at 83.) Additionally, Ms. Wade testified FCCS first became involved with the children in 2016 when they were adjudicated abused. (May 28, 2024 Tr. at 84.)

{¶ 18} Ms. Wade testified that father's case plan required him to complete random drug screens, complete an alcohol and drug assessment and follow all recommendations, complete a mental health assessment and follow all recommendations, complete parenting classes and follow all recommendations, complete a domestic violence assessment and follow all recommendations, and obtain and maintain stable housing and employment. (May 28, 2024 Tr. at 86.) Ms. Wade said the agency no longer had concerns about domestic violence and did not require father to complete a domestic violence assessment. (May 28, 2024 Tr. at 93.) Ms. Wade testified that father completed the parenting classes and the mental health assessment but he did not complete the recommendations from the mental health assessment. (May 28, 2024 Tr. at 86-87.) Ms. Wade said she repeatedly reminded father, both at meetings and by text message, that he needed to complete the recommendations of the mental health assessment. (May 28, 2024 Tr. at 87.) Ms. Wade

testified she had not observed any mental health concerns during her visits with father. (May 29, 2024 Tr. at 16.)

{¶ 19} Additionally, Ms. Wade stated that father completed his alcohol and drug assessment but had not completed the follow up recommendations of outpatient treatment. (May 28, 2024 Tr. at 88-90.) Ms. Wade testified that father was discharged from outpatient treatment due to lack of contact and father never told her he could not complete treatment because of an issue with his insurance. (May 28, 2024 Tr. at 90.) At her meetings with father, Ms. Wade said she repeatedly discussed with him the need to complete the alcohol and drug treatment recommendations and that she provided him with a self-referral list of treatment options. (May 28, 2024 Tr. at 91.) Ms. Wade testified father has indicated transportation and his work schedule are a barrier to completing random drug screens and she has offered to reschedule appointments for him and provided him with bus passes when requested. (May 28, 2024 Tr. at 92-93.)

{¶ 20} Ms. Wade testified she had been able to meet with father at various job sites. (May 28, 2024 Tr. at 93-94.) Father was working construction jobs for his brother and a friend, and Ms. Wade said the agency had linked father with a community service worker to help him find other employment. (May 28, 2024 Tr. at 94.) Ms. Wade testified that father had not been able to provide proof of income and he did not have housing. (May 28, 2024 Tr. at 95.) Ms. Wade said she attempted to assist father with finding housing by referring him three different times to Family to Family but Family to Family had "issues maintaining . . . contact" with father and had to close his file as a result. (May 28, 2024 Tr. at 96.) In addition to the referrals to Family to Family, Ms. Wade said she provided father with a list of various housing resources for Second Chance Housing and attempted to search for housing for him, and the community service worker provided father with a list of private landlords. (May 28, 2024 Tr. at 96.) Ms. Wade testified she provided father with the Second Chance Housing referral on three separate occasions and had helped father locate the information in his email. (May 28, 2024 Tr. at 97.)

{¶ 21} Ms. Wade testified that the community service worker provided father a list of housing options but father reported he was told he needed to have guardianship of his children in order to qualify for those housing options. (May 28, 2024 Tr. at 97.) In response, Ms. Wade said the community service worker provided father a list of private

landlords that did not impose the same proof of guardianship requirement. (May 28, 2024 Tr. at 97.) Additionally, Ms. Wade said she explored the possibility of providing father with a housing voucher, but FCCS ultimately was not able to do so because housing was not father's only barrier to reunification. (May 28, 2024 Tr. at 97-98.) Because father has not consistently completed drug screens or followed through on his mental health and alcohol and drug treatment recommendations, Ms. Wade said the agency would not provide him with a housing voucher. (May 28, 2024 Tr. at 98.)

{¶ 22} Ms. Wade testified father never asked her for the children's social security cards to assist his housing search. (May 29, 2024 Tr. at 18.) It was Ms. Wade's understanding that the conversation about needing the children's social security cards occurred between father and the community service worker, though father later told Ms. Wade about this conversation. (May 29, 2024 Tr. at 54-55.) Ms. Wade also testified that this requirement related only to one of the housing authorities to which father was referred. (May 29, 2024 Tr. at 60.) Even if father obtained housing, Ms. Wade testified she still had other concerns that father would not be able to meet the children's needs. (May 29, 2024 Tr. at 69.)

{¶ 23} Further, Ms. Wade testified father consistently attended visits with the children. (May 29, 2024 Tr. at 7.) She described father as "always engaged," bringing an activity or snacks for the children, and giving appropriate parental advice to the children. (May 29, 2024 Tr. at 7.) In between the scheduled visits, Ms. Wade said father maintained contact with the children through text messages, phone calls, and attending B.B.'s sporting events. (May 29, 2024 Tr. at 7.) Ms. Wade described B.B. as "very bonded" to father, and said father and E.B. had a level of bonding that had significantly improved. (May 29, 2024 Tr. at 31.)

{¶ 24} Ms. Wade testified mother had one visit with the children during her incarceration in December 2023. (May 29, 2024 Tr. at 8.) Ms. Wade said the visit "went very well," and the children were very excited to see mother. (May 29, 2024 Tr. at 8.) However, Ms. Wade said that, after the visit, mother reported she did not want the children to be transported to the correctional facility or for the children to see her there. (May 29, 2024 Tr. at 8.) Mother maintained regular contact with the children through phone calls. (May 29, 2024 Tr. at 8.)

{¶ 25} After being placed together in multiple foster homes for over a year, Ms. Wade said the children were eventually placed in separate foster homes due to "tension and resentment" between the children. (May 29, 2024 Tr. at 10.) Ms. Wade testified B.B. was "doing great" in his current foster home, his behavior had improved, and he was doing well in school. (May 29, 2024 Tr. at 10.) B.B.'s foster placement at the time of trial was a potential adoptive home. (May 29, 2024 Tr. at 11.) Additionally, Ms. Wade said E.B.'s behavior had improved in her current foster home. (May 29, 2024 Tr. at 10.) E.B. had some struggles in school, but Ms. Wade said her foster parent advocated for her. (May 29, 2024 Tr. at 10.) Ms. Wade testified both children have been diagnosed with attention deficit hyperactivity disorder ("ADHD"), and E.B. also has oppositional defiance disorder ("ODD"). (May 29, 2024 Tr. at 12-13.) Both children also received weekly counseling. (May 29, 2024 Tr. at 13-14.) Ms. Wade testified father never asked where the children attend school and the information could have been provided to him if he had asked. (May 29, 2024 Tr. at 14.)

{¶ 26} Ms. Wade testified the children needed a legally secure permanent placement and such placement could not occur without a grant of PCC to the agency. (May 29, 2024 Tr. at 14.) Ms. Wade said father was unable to provide permanency and stability due to his lack of housing and failure to address the case plan concerns. (May 29, 2024 Tr. at 14.) Ms. Wade testified she did not believe father could meet the children's basic needs. (May 29, 2024 Tr. at 64.) Ultimately, Ms. Wade asked the trial court to grant the agency's motion for permanent custody. (May 29, 2024 Tr. at 15.)

{¶ 27} The final witness at trial was Susan Christoff, the guardian ad litem for the children. (May 29, 2024 Tr. at 70-71.) Ms. Christoff testified both E.B. and B.B. were comfortable in their current foster placements. (May 29, 2024 Tr. at 73.) She also said the children seemed happy at visits with father and had an "easy relationship" when they were all together. (May 29, 2024 Tr. at 75.) Ms. Christoff testified the children were bonded to father. (May 29, 2024 Tr. at 75.) She also said they were bonded to their current foster parents. (May 29, 2024 Tr. at 80.)

{¶ 28} Ms. Christoff described the children's special needs, stating both children were seeing counselors and had medication for ADHD, received counseling for past

concerns of trauma, and were in treatment for ODD. (May 29, 2024 Tr. at 77.) Additionally, both children have educational assistance plans at school. (May 29, 2024 Tr. at 77.)

{¶ 29} Ms. Christoff testified the children are able to understand the nature of the proceedings. (May 29, 2024 Tr. at 77.) She said E.B. most recently expressed that "she is okay staying with her foster parent, and she has no wish to be adopted[,] [and] . . . she would be okay going with her father if he had a home." (May 29, 2024 Tr. at 78.) As to B.B., Ms. Christoff testified "he's okay staying with his foster parents, but he also would like to be with his father if his father had housing." (May 29, 2024 Tr. at 79.) B.B.'s current foster home was a prospective adoptive placement. (May 29, 2024 Tr. at 79.) Ms. Christoff said she had spoken with father about the need for housing but he did not specifically express to her the barriers he was encountering in his search for housing. (May 29, 2024 Tr. at 78-79.)

{¶ 30} Ms. Christoff also explained the children's wishes had evolved throughout the pendency of the case. (May 29, 2024 Tr. at 82-83.) When she first became involved with the children, Ms. Christoff said both children expressed they wanted to stay with their parents. (May 29, 2024 Tr. at 82.) Once the children were placed in separate foster homes, Ms. Christoff said they both "were okay staying where they were and they would be okay being with their father as long as the father had housing and as [E.B.] had said housing and he had employment, and you know, was clean and other things in the house." (May 29, 2024 Tr. at 83.) E.B. also expressed a desire to live with mother if mother were to be released from prison "as long as her mom had an opportunity to get her things together." (May 29, 2024 Tr. at 84.) Ms. Christoff testified E.B.'s wishes changed as she realized mother would not be released from prison early and began to work on her relationship with father. (May 29, 2024 Tr. at 84.) Most recently, a month prior to trial, Ms. Christoff said E.B. expressed "she would like to stay with her foster - - her current foster home and possibly be adopted by her foster mother that would be her wish." (May 29, 2024 Tr. at 84.) Though E.B. had initially expressed opposition to adoption, she had most recently expressed that "she might be open to being adopted by her current foster mother." (May 29, 2024 Tr. at 85.) Ms. Christoff said the children have had "a realization" over the pendency of the case of "what it is to be in a secure house with caring adults . . . they can rely on" for their daily needs. (May 29, 2024 Tr. at 104.)

{¶ 31} Ultimately, Ms. Christoff testified it was her recommendation that the court grant the permanent custody motion. (May 29, 2024 Tr. at 79.) She believed it was in the best interest of the children to grant the permanent custody motion because the children needed a legally secure placement. (May 29, 2024 Tr. at 79-80.) Ms. Christoff did not believe either parent would be able to provide the children with stability and permanency within a reasonable time. (May 29, 2024 Tr. at 80.) She said it was "not an easy decision" because the children were close to father, but father is not able to provide the children with stability or provide for their basic needs. (May 29, 2024 Tr. at 80-81.)

{¶ 32} In a July 31, 2024 decision and judgment entry, the trial court granted permanent custody of the children to FCCS. The trial court determined termination of father's and mother's parental rights was in the best interest of the children. Father and mother timely appeal.

## II. Assignments of Error

{¶ 33} Father and mother each raise the following three identical assignments of error for our review:

> [I.] The trial court prematurely terminated the father's parental rights when the agency failed to exercise reasonable efforts to assist him with housing.
>
> [II.] The trial court denied the father a fair trial by admitting, over the mother's objection, unreliable hearsay testimony of the caseworker that, based on records "kept as part of the agency's ordinary course of business," he nodded off during a visit due to being under the influence.
>
> [III.] The trial court erred by not fully considering the wishes of the children, especially E.B. Specifically, the trial court should have inquired or held a hearing as to E.B.'s wishes after the CASA guardian ad litem testified that she did not want to be adopted. The father had a due process right to this determination, for a full and fair assessment of her best interest.

We note that mother concedes "she is not a viable placement option due to her ongoing incarceration and resulting inability to work the case plan." (Mother's Brief at 22.) Thus, mother's assignments of error relate to the termination of father's parental rights.

### III.  First Assignment of Error–Reasonable Efforts

{¶ 34} In their first assignment of error, father and mother argue the trial court erred in terminating father's parental rights because FCCS did not exercise reasonable efforts to assist father with housing.

{¶ 35} Parents have a constitutionally protected fundamental interest in the care, custody, and control of their children.  *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990) (recognizing the right to raise one's children is a basic and essential civil right).  However, these rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child.  *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re D.A.*, 2007-Ohio-1105, ¶ 11.  In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest.  *D.A.* at ¶ 11, citing *Cunningham* at 105.  Because termination of parental rights "has been described as 'the family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows.' "  *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 36} R.C. 2151.414 governs the termination of parental rights.  *In re K.H.*, 2008-Ohio-4825, ¶ 42.  Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that: (1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so.  *In re Z.C.*, 2023-Ohio-4703, ¶ 7.  Clear and convincing evidence is the measure or degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  Clear and convincing evidence requires more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt as in criminal cases.  *Id.*

{¶ 37} An appellate court will not reverse a trial court's determination on a permanent custody motion unless it is not supported by the sufficiency of the evidence or it is against the manifest weight of the evidence, depending on the nature of the arguments presented by the parties.  *See Z.C.* at ¶ 18 (rejecting use of the abuse of discretion standard

in reviewing permanent custody determinations under R.C. 2151.414 and clarifying that separate standards for sufficiency and manifest weight of the evidence apply instead). The sufficiency of the evidence standard tests the adequacy of the evidence, and a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The manifest weight of the evidence standard concerns the effect of the evidence in inducing belief. *Z.C.* at ¶ 13, citing *Thompkins* at 387. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Furthermore, "although the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis, it should not be used as a substitute for the separate sufficiency and manifest-weight analyses appropriate for permanent-custody determinations." *Id.* at ¶ 15.

{¶ 38} R.C. 2151.419(A)(1) provides that, at specified hearings, the juvenile court must determine whether a children services agency "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The statute applies to "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 2007-Ohio-1104, ¶ 41. "Because [R.C. 2151.419(A)(1)] makes no reference to a hearing on a permanent custody motion, it does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re A.P.*, 2023-Ohio-2463, ¶ 16 (10th Dist.), citing *C.F.* at ¶ 41.

{¶ 39} However, a public children services agency may not file a motion for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under [R.C. 2151.419, and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to

the child's home." R.C. 2151.413(D)(3)(b). Thus, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *C.F.* at ¶ 43; *In re N.M.*, 2021-Ohio-2080, ¶ 58 (10th Dist.) ("[T]he issue of whether the agency made reasonable efforts at reunification only arises at the hearing on a motion for permanent custody if the agency has not established that reasonable efforts were made prior to the hearing."). However, where the trial court finds prior to the permanent custody hearing that the agency made reasonable efforts to reunify the family during the proceedings, the trial court need not make a finding of reasonable efforts in its permanent custody decision. *A.P.* at ¶ 17, citing *In re J.H.*, 2021-Ohio-807, ¶ 65 (10th Dist.).

{¶ 40} Here, prior to the permanent custody hearing, the trial court found FCCS had made reasonable efforts toward reunification when it granted FCCS temporary custody and again when it extended temporary custody. Because the trial court's September 19, 2022 judgment entry awarding temporary custody to FCCS and June 16, 2023 judgment entry extending temporary custody satisfied R.C. 2151.419(A)(1)'s requirement of finding reasonable efforts, it was not necessary for the trial court to make a finding of reasonable efforts in the permanent custody decision. *A.P.*, 2023-Ohio-2463, at ¶ 18.

{¶ 41} Though it was unnecessary for the purpose of granting permanent custody, the trial court made another finding of reasonable efforts in its permanent custody decision. Father's and mother's challenge to this finding is unavailing because " ' "[w]e cannot reverse a judgment based on an alleged error in a finding that the trial court never had to make in the first place." ' " *Id.* at ¶ 19, quoting *In re Bil.I.*, 2023-Ohio-434, ¶ 30 (10th Dist.), quoting *In re J.H.* at ¶ 66. Additionally, father and mother could have challenged the trial court's earlier reasonable efforts findings by timely objection or appeal but did not do so. For this additional reason, father's and mother's argument lacks merit. *Id.*, citing *Bil.I* at ¶ 30 ("Because appellants failed to object to or appeal the earlier reasonable efforts findings at the time they were made, they cannot challenge those findings now [on appeal].").

{¶ 42} Father and mother additionally argue that even if the trial court was not required to make a finding of reasonable efforts under R.C. 2151.419(A)(1), the trial court nonetheless was required to determine whether FCCS engaged in reasonable efforts before determining the children cannot or should not be placed with either parent in a reasonable

time under R.C. 2151.414(B)(1)(a) and 2151.414(E)(1). "To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the 'reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *C.F.*, 2007-Ohio-1104, at ¶ 42; *In re D.D.*, 2023-Ohio-4147, ¶ 23 (10th Dist.). Father and mother argue FCCS did not engage in reasonable efforts to assist father with housing.

{¶ 43} "Reasonable efforts" requires a children's services agency to act diligently and provide appropriate services to the family in an effort toward reunification. *D.D.* at ¶ 24, quoting *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). However, "[r]easonable efforts do not equate to all available efforts" because there could "always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Internal quotations and citations omitted.) *Id.* at ¶ 25, quoting *In re B.F.*, 2021-Ohio-4251, ¶ 11 (3d Dist.). Whether reasonable efforts were made depends on the unique facts and circumstances of each case. *Id.*, quoting *In re C.B.C.*, 2016-Ohio-916, ¶ 76 (4th Dist.).

{¶ 44} The trial court thoroughly summarized the evidence related to housing, noting it was a major focus of the trial. Though father testified he could not obtain housing because he did not have the children's social security cards and FCCS did not provide those documents to him, the caseworker clarified that the issue related to the children's social security cards and birth certifications was not one of documentation but that father did not have guardianship of the children. Additionally, that issue applied only to one of the housing authorities to which father was referred. (May 29, 2024 Tr. at 60.) The caseworker testified that she provided father with additional resources for housing. Prior efforts to link father with housing resources were unsuccessful because father failed to maintain contact with the service provider. The caseworker explained to father that he needed to complete his other case plan objectives before FCCS could provide him a housing voucher. However, Father testified it was his criminal record, not his income, that was a bar to him obtaining housing. The community service worker and the caseworker also provided father referrals to second-chance housing and private landlords. The trial court concluded that despite the efforts of the agency and the community service worker, father "appear[ed] unable to help

himself" (July 31, 2024 Decision and Jgmt. Entry at 22) and "unwilling[] to support his children by showing an unwillingness to provide an adequate, permanent home for the children" (July 31, 2024 Decision and Jgmt. Entry at 21). Thus, the trial court determined FCCS made reasonable efforts toward reunification. Father and mother argue these efforts were not reasonable and diligent under the circumstances.

{¶ 45} Though father and mother disagree with the trial court's reasonable efforts determination, we note the trial court additionally found R.C. 2151.414(B)(1)(d) applied as the children had been in the custody of FCCS for 12 or more months of a consecutive 22-month period. Father and mother do not dispute that E.B. and B.B. had been in the temporary custody of FCCS for 12 or more months of a 22-month period at the time of trial. Even though the trial court determined both R.C. 2151.414(B)(1)(a) and (d) applied, only one of the factors in R.C. 2151.414(B)(1) needs to be established in order for the trial court to proceed to the best interest determination. *In re S.C.-N.*, 2022-Ohio-3064, ¶ 62 (10th Dist.). " 'When a child has been in the temporary custody of FCCS for 12 or more months in a consecutive 22-month period, the court need not find that the child cannot or should not be placed with either parent within a reasonable time.' " *In re C.W.*, 2020-Ohio-1248, ¶ 56 (10th Dist.), quoting *In re D.G.*, 2010-Ohio-2370, ¶ 11 (10th Dist.) (noting R.C. 2151.414(B)(1)(a) and (d) are mutually exclusive, and R.C. 2151.414(B)(1)(a) "becomes relevant only where the child has not been in agency custody for the requisite time" under R.C. 2151.414(B)(1)(d)). The trial court is not required to make a reasonable efforts determination during the permanent custody hearing related to a finding under R.C. 2151.414(B)(1)(d). *A.P.*, 2023-Ohio-2463, at ¶ 13 ("Because the establishment of the time requirements under R.C. 2151.414(B)(1)(d) is not disputed, it is inconsequential whether the trial court properly also determined, pursuant to R.C. 2151.414(B)(1)(a) and (E), whether the children cannot or should not be placed with either parent within a reasonable time."). Thus, because R.C. 2151.414(B)(1)(d) applied, father's and mother's arguments about FCCS's reasonable efforts are unpersuasive. *Id*.

{¶ 46} We are sympathetic to father's argument that the fundamental importance of housing may have impacted his ability to comply with other components of his case plan, and we wish to emphasize that the efforts of children's services agencies must remain focused on the goal of reunification throughout the pendency of the case. Though father

did not clearly communicate his difficulties in obtaining housing to the caseworker, we urge FCCS, going forward, to undertake diligent efforts not just to recommend services but to actively assist in meeting case plan goals. However, " '[t]he issue is not whether there was anything more that [the children services agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of this case.' " *In re Ratliff*, 2005-Ohio-1301, ¶ 36 (10th Dist.), quoting *In re Leveck*, 2003-Ohio-1269, ¶ 10 (3d Dist.). Here, father's lack of housing predated FCCS's involvement in the case in 2016, and, despite being provided numerous resources, father did not make progress toward securing housing during the years-long duration of this case.

{¶ 47} Despite our concerns that more could be done to assist with housing, given the application of R.C. 2151.414(B)(1)(d), we are constrained by our standard of review and must overrule mother's and father's first assignment of error.

## IV. Second Assignment of Error–Evidentiary Rulings

{¶ 48} In their second assignment of error, father and mother argue the trial court erred when it admitted inadmissible hearsay testimony into evidence.

{¶ 49} During the permanent custody hearing, in response to a direct question, Ms. Wade, the FCCS caseworker, stated she had not personally observed father under the influence. (May 29, 2024 Tr. at 63.) The following exchange then occurred:

> Q: And what are the case logs?
>
> A: Case logs are documentation of what happens, any contacts or visitations or observations of parties of the case.
>
> Q: And are those records kept as part of the Agency's ordinary course of business.
>
> A: Yes.
>
> Q: And do you review those records on any case that you're on?
>
> A: Yes.
>
> Q: And have you reviewed records regarding anyone else who has witnessed any signs of influence -- of [father] being under the influence during visits?

A: Yes.

Q: And what do you recall about what you reviewed?

[MOTHER'S COUNSEL]: Objection. Hearsay.

[TRIAL COURT]: Overruled. You can answer, ma'am.

A: There was one visit. I believe it was in June of last year where [father] was observed to be nodded off during the visit and the visit was cut short and that was during the hour visit.

(May 29, 2024 Tr. at 63-64.) On appeal, father and mother argue this testimony constituted impermissible hearsay.

{¶ 50} The trial court has discretion to admit or exclude relevant evidence. *In re D.W.*, 2015-Ohio-3205, ¶ 11 (10th Dist.), citing *State v. Angus*, 2006-Ohio-4455, ¶ 16 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. A reviewing court will not reverse an evidentiary ruling unless the trial court abused its discretion in a manner that materially prejudices the affected party. *McKeny v. Ohio Univ.*, 2017-Ohio-8589, ¶ 38 (10th Dist.), quoting *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 2015-Ohio-3841, ¶ 41 (10th Dist.); *D.W.* at ¶ 11. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State ex rel. Deblase v. Ohio Ballot Bd.*, 2023-Ohio-1823, ¶ 27.

{¶ 51} Generally, a statement is impermissible hearsay if it is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C) and 802. However, Evid.R. 803(6) provides an exception to the hearsay rule for records of "regularly conducted business activity . . . if it was the regular practice of that business activity to make the . . . record . . . as shown by the testimony of the custodian or other qualified witness." Additionally, Evid.R. 803(8) provides another exception to the hearsay rule for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report."

{¶ 52} Father and mother argue that even if the case log to which Ms. Wade referred was a business record within Evid.R. 803(6), the trial court nonetheless erred in permitting

Ms. Wade to testify about the record because she did not create the record and she lacked personal knowledge of its contents. For purposes of Evid.R. 803(6), "[a] qualified witness is someone with enough familiarity with the record-keeping system of the business to explain how the record came into existence in the ordinary course of business." *U.S. Bank Natl. Assn. v. George*, 2020-Ohio-6758, ¶ 18 (10th Dist.), citing *State v. Hood*, 2012-Ohio-6208, ¶ 39. " 'Evid. R. 803(6) does not require the witness whose testimony establishes the foundation for a business record to have personal knowledge of the exact circumstances of preparation and production of the document or of the transaction giving rise to the record.' " *Id.*, quoting *Cach v. Alderman*, 2017-Ohio-5597, ¶ 16 (10th Dist.). Thus, the Rules of Evidence do not prohibit Ms. Wade from authenticating a business record simply because she was not the individual who created the record.

{¶ 53} Father and mother additionally argue that even if the case log, itself, was properly construed to be a business record or a record of a public agency, only the case log, itself, should have been admitted–not Ms. Wade's testimony about the case log. Because FCCS did not introduce the actual case log below, father and mother argue the trial court erred in permitting Ms. Wade's testimony about the case log. *See In re McLemore*, 2004-Ohio-680, ¶ 9 (10th Dist.) ("there is no hearsay exception, either in Evid.R. 803 or 804, that allows a witness to give hearsay testimony of the content of business records based only upon a review of the records").

{¶ 54} This court has recently addressed the admissibility of a successor caseworker's testimony in a permanent custody hearing. In *In re S.C.-N.*, 2022-Ohio-3064, we explained, "[i]t is not error for a social worker to testify to reports that predated his or her assignment to a particular case." *S.C.-N.* at ¶ 88. Under either Evid.R. 803(6) or Evid.R. 803(8), "a social worker's testimony concerning records kept by the agency, statements made by a parent, and reports taken during the course of the agency's investigation, are admissible because the contents of her file . . . had been compiled as part of the Agency's activities." *S.C.-N.* at ¶ 89, citing *In re D.M.*, 2018-Ohio-4737, ¶ 27 (5th Dist.). Thus, in a permanent custody hearing, a trial court can rely on the testimony of a successor caseworker about the contents of agency records compiled by a predecessor. *Id.* at ¶ 90 ("[t]he trial court properly relied on the testimony by a successor caseworker"). *See*

*also In re T.G.*, 2022-Ohio-1213, ¶ 71-74 (5th Dist.) (a caseworker may testify to the contents of the case file even where the caseworker has no personal knowledge of those facts).

{¶ 55} Accordingly, pursuant to our decision in *In re S.C.-N.*, we conclude the trial court did not err in allowing Ms. Wade's testimony about the FCCS case logs compiled by a predecessor case worker.  We overrule father's and mother's second assignment of error.

## V.  Third Assignment of Error–Consideration of the Children's Wishes

{¶ 56} In their third and final assignment of error, father and mother argue the trial court erred by not fully considering the wishes of the children in making its best interest determination.

{¶ 57} As outlined above, a trial court takes a two-step approach in considering whether to award permanent custody.  *In re A.L.*, 2022-Ohio-4095, ¶ 29 (10th Dist.).  First, the trial court must determine if any of the factors in R.C. 2151.414(B)(1) apply.  *Id.*; *Z.C.*, 2023-Ohio-4703, at ¶ 7.  Here, the trial court determined E.B. and B.B. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, thus satisfying R.C. 2151.414(B)(1)(d).  The record here supports the trial court's determination that one or more of the factors in R.C. 2151.414(B)(1) apply.

{¶ 58} Once the trial court determines one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) applies, the trial court then must determine whether a grant of permanent custody is in the best interest of the child.  *A.L.* at ¶ 31, citing *In re A.J.*, 2014-Ohio-2734, ¶ 16 (10th Dist.); *Z.C.* at ¶ 7.  To determine the best interest of the child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for

twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not assign any one factor "greater weight than the others." *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

{¶ 59} Father and mother argue the trial court did not adequately consider the children's wishes pursuant to R.C. 2151.414(D)(1)(b). In the July 31, 2024 decision and judgment entry, the trial court stated:

Both children, as represented through the [guardian ad litem] and their own attorneys, have expressed their wishes. [E.B.] wishes to be adopted. [B.B.] wishes to reunify with his Father, if possible. Otherwise, he wishes to remain where he is.

(July 31, 2024 Decision and Jgmt. Entry at 30.) Father and mother assert this finding is inconsistent with the evidence at trial and E.B. did not wish to be adopted. At minimum, father and mother argue the trial court should have inquired further or conducted a hearing as to E.B.'s wishes after the guardian ad litem testified E.B. did not want to be adopted.

{¶ 60} Father and mother point to the testimony of Ms. Christoff, the guardian ad litem for the children, as contradicting the trial court's finding. Specifically, they rely on Ms. Christoff's testimony that E.B. "most recently related to [the guardian ad litem] in April of this year that she is okay staying with her foster parent, and she has no wish to be adopted." (May 29, 2024 Tr. at 78.) However, a review of the record indicates the evidence at trial supports the trial court's findings under R.C. 2151.414(D)(1)(b).

{¶ 61} Despite Ms. Christoff initially stating E.B. had no wish to be adopted, Ms. Christoff later clarified in her testimony that the children's wishes had evolved over time.

Ms. Christoff explained that although E.B. initially did not want to be adopted, E.B. realized over time her father would not be able to care for her, and E.B. most recently expressed to the guardian ad litem that she wanted to stay with her current foster mom and possibly be adopted by her. (May 29, 2024 Tr. at 82-84.) Ms. Christoff testified that E.B. "modified" her desires as the case progressed and was "open to being adopted by her current foster mother." (May 29, 2024 Tr. at 85.) This is consistent with E.B.'s in-camera interview with the trial court in April 2024 during which she expressed a desire to be adopted. (May 29, 2024 Tr. at 84; In Camera Tr. at 45.) The trial court also appointed separate counsel for E.B. and B.B. after E.B. expressed her desire to be adopted. (May 29, 2024 Tr. at 85-86.) At the permanent custody hearing, counsel for E.B. stated that E.B. wanted the court to grant the permanent custody motion. (May 28, 2024 Tr. at 10.) While Ms. Christoff may have misspoken early in her testimony, her testimony overall reflects, consistent with the in-camera interview and position of E.B.'s counsel, that E.B. came to realize over time that she would like to be adopted.

{¶ 62} Thus, the evidence at trial is consistent with the trial court's determination that E.B. wanted to be adopted. Though father and mother argue the trial court failed to investigate E.B.'s wishes further, the record indicates the trial court carefully considered E.B.'s wishes as reflected by multiple sources. Accordingly, the manifest weight of the evidence supports the trial court's finding that E.B. wished to be adopted. We overrule father's and mother's third and final assignment of error.

## VI. Disposition

{¶ 63} Based on the foregoing reasons, the trial court did not err in determining FCCS engaged in reasonable efforts toward reunification, in making evidentiary determinations related to the contents of agency records, and in considering and determining E.B.'s wishes before making its determination that granting the motion for permanent custody and terminating father's and mother's parental rights was in the best interest of the children. Having overruled father's and mother's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

JAMISON, P.J. and MENTEL, J., concur.

_____